268 F.Supp. 434 (1967)
In the Matter of Imogene JACKSON, Bankrupt.
No. 66 B 1029(3).
United States District Court E. D. Missouri, E. D.
April 6, 1967.
*435 *436 Wilson Gray, St. Louis, Mo., for Imogene Jackson.
Richard A. Gephardt, of Thompson, Mitchell, Douglas & Neill, St. Louis, Mo., for petitioner, Mercantile Trust Co. Nat. Assn.
Ben Zuke, St. Louis, Mo., trustee.
Wm. O'Herin, St. Louis, Mo., referee in bankruptcy.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
This petition for review of an order of the Referee in Bankruptcy denying the reclamation petition of Mercantile Trust Company, National Association, (Mercantile) involves the construction of the Missouri statute governing the perfection of security liens on motor vehicles.
The facts were stipulated and are not in dispute. On July 7, 1965, the bankrupt, Imogene Jackson, a resident of Missouri, purchased from Thoms Pontiac, Inc., a Missouri dealer, a new automobile. She paid part of the purchase price in cash and by a trade-in, and for the balance she executed (jointly with her husband) a negotiable promissory note secured by a chattel mortgage security agreement. Shortly thereafter, the note and security agreement were sold and transferred for value and in the regular course of business to Mercantile, the present holder thereof.
On the date of the purchase, July 7, 1965, Thoms Pontiac, Inc. prepared and executed, and bankrupt also executed on form MMV-1 of the Missouri Department of Revenue an application for a Missouri certificate of title to the automobile in question.
The form used was one which was designated as "Application for Missouri Title and/or License", a form which had been utilized for a number of years for the dual purpose of making application not only for titles but also for registration of motor vehicles. This form consists of several identical copies of the application except that each copy is a different color, one of which is white and one is blue. Although the stipulated facts do not expressly so state, it appears to be conceded that bankrupt signed all four copies of this application, the first of which was apparently the white copy.
On July 21, 1965, the blue copy of the application was sent to the Office of the Supervisor of Motor Vehicle Registration, Department of Revenue of the State of Missouri, by Mercantile, together with the payment to the director of revenue of the sum of $1.00. The application and accompanying payment were received and validated in the office of the Supervisor on July 22, 1965 and held in a suspense file pending receipt of other copies of the application and the payment of the applicable Missouri sales or use tax and the license registration fee.
The Missouri use or sales tax was never paid nor was the automobile ever registered for licensing purposes. At no time prior to the filing of petition in bankruptcy on May 5, 1966 were any of the other copies of the Application delivered to the director of revenue (or to his subordinate, the Supervisor of Motor Vehicle Registration) and no certificate of ownership was issued to the bankrupt. Following his appointment, the trustee in bankruptcy took possession of the automobile and upon his refusal to surrender the same to Mercantile, the reclamation petition was filed.
Effective July 1, 1965, a radical change was effected in the Missouri law pertaining to the perfection of security liens on automobiles. Prior thereto, it was necessary for the chattel mortgage or other security instrument to be promptly filed or recorded in the appropriate county (usually the county of residence of debtor) in order to perfect the lien as against certain persons not parties to the instrument. Section 443.460, V.A.M.S. This statute (and others) were repealed as of July 1, 1965, by the Uniform *437 Commercial Code (Laws of Missouri 1963, page 638, Section 10-102).
Article 9 of the Code pertains to secured transactions, and inter alia, in Section 400.9-401 prescribes the place of filing when filing is necessary to perfect a lien. However, the filing provisions of the Code have no application to motor vehicles and the perfection of liens therein. Instead, Section 301.600, V.A. M.S., part of a subsequently enacted statute also effective July 1, 1965, provides the sole and exclusive method to be followed for perfecting a security interest in a motor vehicle in the circumstances involved in this case. Section 301.650, V.A.M.S., expressly so states.
Hence, although the Code and other statutes to be discussed infra are relevant in ascertaining the meaning and intent of the language employed in Section 301.600, we must measure what Mercantile did against the requirements of subsection 2 of Section 301.600 in determining whether its lien was perfected as of the time of the creation thereof. This subsection provides that a lien or encumbrance on a motor vehicle is perfected by the delivery to the director of revenue of (1) the existing certificate of ownership, if any, (2) an application for a certificate of ownership containing the name and address of the lien holder and the date of his security agreement, and (3) the required certificate of ownership fee. The statute further provides that if the delivery of the foregoing "is completed within thirty days" after the creation of the lien or encumbrance, it is perfected as of the time of its creation, otherwise as of the time of the delivery. There being no existing certificate of ownership on the automobile purchased by Mrs. Jackson, there was concededly neither the necessity nor the possibility of delivering such an instrument to the director of revenue.
The stipulated facts demonstrate that there were delivered to the director of revenue an instrument in writing purporting to be an application for a certificate of ownership signed by the owner of the motor vehicle, together with the required certificate of ownership fee in the sum of $1.00. The "application" contains the name and address of the lien-holder, Mercantile, and the date of the chattel mortgage security agreement. The "application" and the fee were "delivered" to the director of revenue on July 22, 1965, less than 30 days after the execution of the chattel mortgage. Hence, unless the written instrument delivered to the director of revenue is not "an application for a certificate of ownership" within the meaning of Section 301.600, the requirements of this statute have been fully and literally met and the lien perfected as of July 7, 1965.
For many years, Missouri statutes have provided for annual registration of motor vehicles for license purposes and prescribed the procedure to be followed for that purpose. Section 301.020 et seq. V.A.M.S. An application for registration must be made "on a blank to be furnished by the director of revenue for that purpose." The application for registration must contain (1) "a brief description of the motor vehicle, including the name of the manufacturer," (2) the manufacturer's or other identifying number, (3) information as to the horse-power, and (4) the name, residence and business address of the owner of the motor vehicle. Additional information is required for the registration of commercial and specially constructed or reconstructed motor vehicles. Section 301.020, V.A.M.S. This application must be accompanied by certain required proof of payment of the Missouri personal property tax, or of the owner's non-liability therefor.
Section 301.190, V.A.M.S., prohibits the director of revenue from issuing a certificate of registration unless the applicant therefor also makes application for and is granted a certificate of ownership of the motor vehicle. Such application must be made "upon a blank form furnished by the director of revenue." The latter application must contain (1) "a full description of the motor vehicle," (2) the manufacturer's or other identifying number, (3) a statement of the *438 source of the applicant's title, and (4) a statement of any lien or encumbrance on the motor vehicle.
Effective July 1, 1965, Section 301.190 was amended to provide that the application for a certificate of ownership must be made within 30 days after the applicant acquires the motor vehicle, and if not made within such period a delinquency penalty of $5 per month, but not to exceed a total of $25, is imposed upon the owner. It is unlawful to operate a motor vehicle in Missouri which is required to be registered for licensing unless a certificate of ownership has been issued therefor. Section 301.190, subsection 4.
Complicating the problem is the Missouri Sales Tax Law, Chapter 144, V.A. M.S., as it applies to sales of motor vehicles. In general, retail sellers of property are required to collect the applicable tax from the purchaser thereof. However, dealers in motor vehicles are expressly relieved of any obligation to collect the sales or use tax imposed by Sections 144.070 and 144.440, V.A.M.S., upon purchasers of automobiles. Section 144.080, subsection 2, V.A.M.S. In the case of motor vehicles, the applicable statutes provide that "at the time" the owner "makes application to the director of revenue for an official certificate of title and the registration of said automobile," he must "present" to the director of revenue satisfactory evidence of the amount of the purchase price and also "pay or cause to be paid" the proper amount of the sales or use tax based upon such purchase price. Sections 144.070 and 144.440, V.A.M.S. These statutes prohibit the director of revenue from issuing a certificate of title until the tax has been paid, and require the director to endorse on the certificate of title an entry showing the payment of the tax.
It is thus evident, under Missouri law, that without regard to the question of the perfection of security interests, a person who acquires title to an automobile must make "an application" for the registration thereof on a form furnished by the director of revenue, but he cannot obtain such a certificate of registration or license until the director has issued a title (certificate of ownership) to him. Before such a certificate of title may be issued, the owner must "make application" therefor, also on a form to be furnished by the director. And finally, the owner must present evidence satisfactory to the director of revenue respecting the amount of the purchase price "at the time" he makes application for a certificate of title, and the certificate cannot be issued until the owner pays the amount of the sales or use tax to the director.
Thus, at least two separate applications are expressly provided for, each for a different purpose. The primary purposes of registration are the identification of the vehicle and the production of revenue by the collection of an annual fee. The purpose of issuing a title is to maintain a system for establishing title to motor vehicles. A more recent purpose has been to assure the collection of the applicable sales or use tax on the transfer of a motor vehicle.
We are informed that in thousands of instances persons acquiring motor vehicles evade the payment of the not insubstantial amount of the sales or use tax by the device of illegally transferring a license plate from one vehicle to another and thereafter operating the car with neither a certificate of title nor of registration. The stipulated facts do not advise us whether the bankrupt was guilty of misconduct of this nature, although it is reasonably to be inferred that she did so, from the fact that bankruptcy did not intervene for some 10 months after the purchase of the new car. It appears rather obvious that the only motive bankrupt could reasonably have had for failing to file her "original" applications for title and registration was to avoid paying the sales tax.
This poses the basic question: does Missouri law require a lienholder to be penalized because of the default of the owner of the motor vehicle in failing to comply with statutory obligations which are not imposed upon the lienholder and for which the lienholder is not responsible? *439 In our opinion, such is neither the legislative intent nor the statutory mandate.
The precise question for decision is whether the words "an application for a certificate of ownership," as used in Section 301.600, subsection 2, should be construed to mean that all duplicate copies of the multiple purpose application form furnished by the director of revenue must be delivered to him in order to perfect a security lien or whether it is sufficient for lien perfection purposes that the lienholder deliver to the director of revenue one copy of the application form signed by the owner which contains all of the information specified therefor.
It was the view of the Referee that the words "an application" in Section 301.600, V.A.M.S., have the same meaning as the "application" provided for in Section 301.190, and since, in his judgment, the director of revenue had administratively "determined" that multiple copies constitute the application required under Section 301.090, then "an application" for purposes of compliance with Section 301.600 consists of such copies thereof as are required by the director of revenue to be delivered or filed with him in order for a certificate of ownership to issue. We do not agree.
In the first place, we believe the Referee's basic premise is erroneous. In our judgment, the director of revenue has not made a "determination" that "an" application for a certificate of ownership alone must in all events consist of as many copies thereof as he requests be executed (3, 4, or 6, the present number furnished by him). It is doubtful in any event that the director was granted the authority to make a "determination" of that nature. It is not at all certain that the word "furnished" as used in Section 301.190 has a meaning broader than its usual one of "supplied" or "provided," and includes "prescribed" as well. We note that the Missouri legislature has on numerous occasions used the word "prescribed" when such was intended.[1] In fact, subsection 3(4) of Section 301.600 provides for the delivery of a notice of lien "in the form the director of revenue prescribes."
As noted supra, the director of revenue has for many years used the same form for both registration and titling purposes, with the result that information in addition to that necessary to procure a certificate of ownership is called for on all copies of the form furnished by the director. It would appear that as drafted the statute actually contemplated separate applications for registration and for obtaining a certificate of ownership, so that it is understandable why the director requires the filing of multiple copies of the same application, each of which contains additional information which is used for a different purpose, and one copy of which is apparently now considered as a sales tax information return.
However, in truth and in fact, only one copy of the application is actually necessary for the director to perform his duties under Sections 301.600 and 301.190, even though the other copies may properly also be required to enable the director to perform his duties under Section 301.020, the registration statute, and Sections 144.070 and 144.440, the sales or use tax statutes. It is, of course, true that a certificate of title cannot issue until after the director receives payment of the sales or use tax, but this does not mean that an application for title cannot be received and lodged in a suspense file before such time. We fail to see how the fact that the director of revenue requires the use of a multiple copy form of application *440 for his own administrative convenience in performing several different duties can affect the meaning of the words "an application" for a certificate of ownership as used in Section 301.600 and impose an additional burden upon a lienholder.
Section 301.600 was not enacted in a vacuum. Its legislative history supports the conclusion we have reached. As noted supra, the Uniform Commercial Code, adopted in 1963 but not to take effect until July 1, 1965, expressly repealed the prior statutes relating to the filing requirements to perfect chattel mortgage security interests. Section 400.9-401 of the Code provides that as to "consumer goods" a financing statement must be filed with the recorder of deeds of the county of the debtor's residence (essentially the same requirement as in the pre-Code statute for filing chattel mortgages). With certain exceptions not here relevant, when the collateral is goods other than consumer goods, central filing of the financing statement in the office of the secretary of state, in addition to local filing in the appropriate county, is required. However, Section 400.9-302(3), V.A.M.S., excepted from the filing provisions of the Code security interests in property subject to a statute which provides for central filing of security interests in such property, or of a motor vehicle (other than inventory held for sale) for which a Missouri certificate of title is required "if a notation of such security interest can be indicated by a public official on a certificate or a duplicate thereof."
Section 301.190 has long required a certificate of title for motor vehicles registered in this state. It also provides that the certificate of ownership shall contain a statement showing any liens against the motor vehicle (information derived from the application). However, this statute was not adequate for Code exemption purposes, since it made no provision for the notation of a lien other than in connection with the transfer of title. Hence, in order to assure that a notation of all security interests in a motor vehicle (whether or not related to a transfer of ownership) can be indicated by a public official on a certificate of title, Section 301.600 was adopted to be effective as of the same time as the Code.
The official text of Section 9-302(3) of the proposed Uniform Code permits each state to select either of two alternatives A and B. Alternative A exempts from the filing provisions of the Code transactions in property subject to a state law "which requires indication on a certificate of title" of security interests in the property. Missouri selected Alternative B (applicable when the security interest can be officially indicated on the certificate of title). The official Comment to this section states in part: "If a certificate of title law requires a certificate to be issued and a notation of all security interests affecting the property can be indicated on the certificate by a public official (even though the law does not require the notation to be made), subsection (3) (b) exempts transactions covered by the law from the filing requirements of this Article (Alternative B)."
Nothing in the language or legislative history of Section 301.600 indicates that the legislature had any intent to use the lien perfection statute as a means of assuring collection of the sales or use tax, a tax for which the lienholder is not liable and in the collection of which he has no function to perform. We note that at the same session of the General Assembly which passed Section 301.600, other statutes were enacted, one of which (amended Section 301.190) permits a "repossessed" title to be issued without liability to the lienholder for unpaid taxes, fees, charges, and penalties, the debtor remaining solely liable therefor, and another of which (amended Section 301.190) penalizes only the purchaser of a motor vehicle for failing to apply for a title within 30 days.
If, as is evident, the lienholder is neither liable for the sales or use tax nor responsible for its collection, then we see no reason to construe Section 301.600 to impose such a responsibility on the lienholder by indirection. That is, since *441 payment of the tax is a condition precedent to the issuance of a certificate of ownership (Sections 144.070 and 144.440), and since at least one of the copies of the "application" relates to proof of such payment, then, if all copies must be filed with the director of revenue, it would follow that in no case involving a transfer of ownership could a lien ever be perfected absent the payment of the tax. Such a result would be unreasonable.
It is no answer to say that the seller can "insist" that the sales tax be collected by him for remittance to the director. In the first place, the Sales Tax Law provides otherwise. The very purpose of excluding motor vehicle transactions from the sales tax collection procedures otherwise applicable was to prevent unscrupulous dealers from collecting and pocketing the tax. And what protection would the purchaser have if a dealer failed to remit the tax he collected without legal authority? In any event, there is nothing in Section 301.600 which grants such authority or imposes such a duty upon the dealer.
It is, of course, true that a court must construe a statute as written, and, where the language is plain and unambiguous, a court should give effect thereto without regard to the results or the wisdom of the law as written. On the other hand, the law favors a construction which harmonizes with reason and which tends to avoid either absurd or unreasonable results. Wellston Fire Protection District v. State Bank and Trust Co., Mo.App., 282 S.W.2d 171, 174. "A statute should not be construed in a way to make it unreasonable, when it can be given a reasonable construction." State ex rel. St. Louis Public Service Co. v. Public Service Commission, 326 Mo. 1169, 34 S.W.2d 486, 489.
Although Section 301.600 does require that the lien be noted on the certificate of title when issued, it does not either in terms or by reasonable inference make such a notation or even the actual issuance of a certificate a sina qua non to the perfection of the lien. The very fact that Missouri had theretofore selected Alternative B in its version of Section 9-302(3) of the Uniform Commercial Code strongly suggests that the legislature did not intend to make the issuance of a certificate of title a prerequisite to the perfection of liens.
What then was the legislative purpose in requiring that "an application" be delivered to the director of revenue for lien perfection purposes? We believe the legislative purpose in enacting Section 301.600 was to provide a simple system of perfecting liens which would protect lienholders holding security interests while at the same time affording adequate notice of the lien to the public, including subsequent transferees and lienholders.
The legislature could, of course, have provided for filing a separate financing statement similar to that used under the Uniform Commercial Code. However, the legislature was aware that Section 301.190 already required every application for a certificate of ownership to contain a statement of any liens or encumbrances on the motor vehicle. Hence, since the additional required information as to liens could easily be set forth on the application for title, we believe the legislative intent was to utilize that method as the means by which all required information respecting liens was furnished to the director of revenue and through him to the public.
Insofar as concerns the basic purpose of any lien perfection statute, we believe that such purpose is served when all of the essential information which would otherwise be set forth in a financing statement has been delivered to the director of revenue either in "an application" for title, in the case of a new vehicle, or "an application" for title accompanied by the existing certificate of title, in the case of a used vehicle.
Any person interested in ascertaining the existence of a lien can do so by inquiry of the director of revenue, since "the application" containing the pertinent facts is a public record on file in his office. As to a new vehicle, there being *442 no existing certificate of title, no one can possibly be misled in such circumstances, because until and unless the certificate is actually issued no valid transfer of title can be made, and when the title is issued it will necessarily contain a notation respecting the lien. Persons who propose to obtain new liens on a motor vehicle for which a certificate of title has already been issued can ascertain the facts respecting thereto from the certificate itself.[2] Thus, there is no public interest which would be served by construing Section 301.600 to require not merely that all information respecting the lien be timely delivered to the director of revenue on "an application", but also that the owner complete all steps necessary to obtain a certificate of title including the payment of the applicable sales tax.
It must be presumed that the legislature was familiar with the procedures followed by the director of revenue in performing his duties relating to the registration and titling of motor vehicles and his requirement that multiple copies of a single application be filed in order to obviate the necessity for an owner to fill out more than one form. By providing merely that "an application for a certificate of ownership" be delivered to the director of revenue, the legislature simply took advantage of existing procedures in order to permit a lien to be perfected upon the delivery of any one copy of the multi-purpose application. To construe the statute to require more would be to read into the statute language which does not appear therein and which would be contrary to its evident purpose.
Section 301.600 is a lien perfection statute and nothing more. To hold that all copies which the director of revenue had theretofore required to be filed to enable him to perform his other duties under the law, must be filed for lien perfection purposes, would make of the statute something other than a mere lien perfection statute.
There is no Missouri case construing Section 301.600. Our function, therefore, is to ascertain as best we can how this statute would be construed by the courts of Missouri. The basic rule applied by Missouri courts in construing statutes "is to ascertain the intention of the lawmakers from the words used, if possible, ascribing to the language its plain meaning, and to effectuate the intent found." State ex rel. MFA Mutual Insurance Co. v. Rooney, Mo.Sup. banc, 406 S.W.2d 1, 3.
We also look to the administrative construction of the statute by the director of revenue who is charged with its administration. On July 1, 1965, the director of revenue issued "Instructions to Perfect a Lien on a Motor Vehicle," which contemplated a new form of "Application for Title and/or License." This revised form consisted of an original and one copy, identical in all respects except for color, the original being designated "buyer's copy" and the copy being designated "Lien Perfection Copy." There was also a so-called "short copy" which is a completely blank sheet of paper apparently intended to be used by the director of revenue only for internal audit purposes in connection with the payment of the sales or use tax and any applicable fees.[3] *443 The Instructions provided that the "lien perfection copy" is to be forwarded to the Director of Revenue, Motor Vehicle Registration, by the lienholder, together with the $1.00 title fee, and state that upon receipt of the copy, it "is validated, and the lien is now perfected. The perfected copy of lien is now held in a Suspense File awaiting the number one (#1) original copy from buyer." When the original copy is received by the Director, and the required tax and fee have been paid, the #1 copy is "matched" with the "lien perfection copy," and the title (certificate of ownership) is then issued. These Instructions make it clear that the director of revenue treats the delivery of the "lien perfection copy" as the delivery of "an application" for a title under the terms of Section 301.600.
The Attorney General of Missouri in an official opinion has also ruled that for purposes of lien perfection the delivery to the director of revenue of any one of the copies of the owner's application for title operates to perfect the lien (the other statutory requirements being complied with). This opinion was issued in connection with the January, 1966, revised form, but clearly is equally applicable to the form theretofore used. It is true that the Attorney General had earlier issued a contrary opinion, but that opinion was withdrawn and is of no effect. The suspended opinion was based at least in part upon misinformation as to the administrative construction of the statute by the director of revenue.
In 36 C.J.S. Federal Courts § 174(3), page 411, it is said, "While the opinion of a state officer as to state law is not controlling on a federal court, the construction of a state statute by the attorney general of a state, or by a state commissioner or other officer who has the duty to execute the law is entitled to great respect and should ordinarily be followed, where judicial decisions construing the statute are lacking. So, great consideration should be given to the opinion of an attorney general in determining the legislative intent in enacting a statute. Also, a settled administrative practice with respect to the interpretation of a statute may be persuasive."
To the same effect is Fisher v. City of Independence, Mo.App., 350 S.W.2d 268, 271, which holds that although opinions of the attorney general of Missouri "do not become the law of the land", nevertheless they "are entitled to great weight, are persuasive and should be followed, especially by state officials, boards and commissions, unless and until a proper court rules otherwise."
The language of Section 301.600 is equivocal at worst. Nothing therein plainly and mandatorily necessitates a construction that the words "an application" means all copies thereof which the director of revenue (but not the statute) requires to be filed for administrative convenience. It appears to us that the attorney general of Missouri having now officially ruled (and the director of revenue in administering the law, having similarly construed it), that the delivery of one executed copy of the application suffices for the purpose of lien perfection, there is no sound reason which should impel us to hold that both the director of revenue and the attorney general of Missouri are wrong in interpreting the meaning and intent of the Missouri statute. This is particularly true where, as here, no public interest can be served by requiring more than do the officials charged with the duty of administering the law.
We hold that Mercantile's security interest in the automobile was validly perfected and that its reclamation petition should have been granted. Nothing in this opinion should be taken as holding that a security interest in a motor vehicle which is not perfected as *444 provided by Section 301.600 is invalid against a trustee in bankruptcy as well as against subsequent transferees and persons holding subsequent security interests in the vehicle. We do not reach that question and its resolution is expressly reserved for a case in which it is in issue.
The petition for review is sustained, and the order of the Referee is reversed with directions to sustain the reclamation petition and grant such further relief to Mercantile as may be required in the premises.
NOTES
[1] See for example (and there are many others) Sections 327.040, ("forms prescribed and furnished"), 329.060 ("a form prescribed and supplied"), 332.040 ("forms prepared and furnished"), 152.020 ("in such manner and form as prescribed by the commission"), 155.020 ("in the form as is prescribed by the state tax commission"), 147.020 and 147.050 ("a report in such form as said commission may prescribe"). And see also Section 144.100 of the sales tax law ("make and file a written return with the director of revenue in such manner as he may prescribe. 2. The returns shall be on blanks designed and furnished by the director of revenue").
[2] It is significant that in instances where a vehicle which is already subject to a lien when brought into this state, and the name of the lienholder is not shown on an existing certificate of title or the lien was not perfected under the laws of the jurisdiction where the lien attached, the lien may be perfected "by the lienholder delivering to the director of revenue a notice of lien or encumbrance in the form the director of revenue prescribes and the required fee." Subsection 3(4), Section 301.600. Such a notice of lien affords the same information and serves the same purpose as does "the application" required in subsection 2.
[3] As of the date the Instructions were promulgated the director of revenue had not yet distributed the new forms as set forth in the Instructions, and pending such distribution he continued the use of the old form of application consisting of 4 identical copies of the form and had agreed to accept the blue copy thereof as the equivalent of the "lien perfection copy" described in the Instructions. The old form, although somewhat different in appearance and content contains the basic information called for on the revised form. Subsequently, in January 1966, the form was again revised and now has 6 copies, the function of each of which has not been explained. In any event, for purposes of this proceeding, the resolution of the legal issue is not dependent on the particular form which was used in the transaction.