**Oral A. WEBB, Plaintiff-Appellant,**

**v.**

**AMERICAN FAMILY FINANCIAL SERVICES, INC., and American Family Mutual Insurance Company, Defendants-Respondents.**

**No. 13001.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 23, 1984.

Motion for Rehearing or Transfer
Denied on March 15, 1984.

Application to Transfer Denied
April 16, 1984.

Abe R. Paul, David W. Ansley, John E. Price, Mary Michael-Kelly, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, for plaintiff-appellant.

B.H. Clampett, Paul D. Rittershouse, Paul D. Wacker, Daniel, Clampett, Rittershouse, Dalton, Powell & Cunningham, Springfield, for defendants-respondents.

FLANIGAN, Presiding Judge.

This action arises out of an alleged wrongful repossession of plaintiff Oral Webb's Cadillac by agents of defendant American Family Financial Services, Inc. Webb was a used car dealer with many years' experience. On July 16, 1979, plaintiff Webb and his ex-wife Betty Webb, with whom he was still living, borrowed $12,600 from defendant in connection with the purchase by Webb of a new Cadillac from Porter Cadillac-Buick, Inc. in Joplin. Using the loan proceeds, and $790 of his own money, Webb paid Porter $13,390 on July 17, 1979, and obtained possession of the vehicle, which was to be his personal car.

As part of the loan transaction Webb and his ex-wife [1] signed a document entitled

---

1. On October 11, 1979, Betty Webb separated from plaintiff and, according to Webb, "she signed an agreement that she did not want any part of the car, that I assumed all responsibility for the car." The parties treat this case as if

"Combined note, loan statement, security agreement, and disclosures required by federal and state law." The note called for monthly payments of $351.25 by Webb to defendant. Initially the first payment was due August 16, 1979, but by agreement of the parties that was changed to September 1, 1979, with subsequent payments due on the first day of each succeeding month.

The security agreement included the following:

"It is hereby agreed by [Webb] that [defendant] shall have a security interest in [the Cadillac], together with all rights and remedies of a Secured Party under the Uniform Commercial Code of this State.

"Borrower [Webb] warrants that he is the owner of [the Cadillac] free and clear of liens.... Borrower agrees to keep [the Cadillac] fully insured against all substantial risks or losses, with insurance reasonably related to the type and value of the property insured and the amount and term of the loan with loss payable to [defendant] ... and to pay all premiums therefor; to pay all taxes and other charges against [the Cadillac] promptly when the same becomes due.

"Time is of the essence of this agreement, and should Borrower fail to pay any indebtedness hereby secured or the interest thereon when the same becomes due or default in any of the Borrower's other obligations or covenants hereunder, or if [defendant] feels insecure in its security, the entire indebtedness hereby secured shall, at the option of [defendant] become immediately due and payable. [Defendant] may then take possession of the property and for that purpose [defendant] may, so far as Borrower can give authority therefor, enter upon any premises on which said property ... may be situated and remove the same therefrom."

Webb failed to insure the Cadillac and also failed to take the necessary steps to obtain a certificate of title to the vehicle showing defendant as the lienholder. He did not pay the sales tax due on the purchase of the vehicle. He did not register the vehicle or obtain the required license plates for it. He "drove it on dealer's tags." Through December 1, 1979, no monthly payments were made, although four were due. On August 28, 1979, defendant wrote a letter to Webb informing him that they had no record that insurance had been obtained on the Cadillac. On September 13, 1979, defendant sent a letter to Webb stating that defendant had not yet received the title to the Cadillac and that sales tax on the vehicle had not been paid. That letter requested Webb to "register your Cadillac." In November 1979 defendant hired a private investigator to attempt to locate Webb and repossess the vehicle. On December 14, 1979, defendant hired another investigator to repossess the vehicle.

On December 17, 1979, Webb paid defendant, belatedly, the first four monthly payments. On January 9, 1980, Webb paid, belatedly, the January 1 payment. On January 21, 1980, defendant, acting through the second private investigator, repossessed the vehicle by taking it from Webb's driveway. This action ensued.

Webb's seven-count petition against defendant and another defendant[2] alleged several grounds of liability including "wrongful taking and conversion" of the Cadillac and items of Webb's personal property which were in it at the time of the repossession, trespass, conspiracy to commit a trespass, breach of a "non-delegable duty to Webb to assure that any physical surveillance or investigation of Webb was conducted in a reasonable and proper manner," and invasion of privacy. The petition

Betty Webb has no interest in it, and this court will do the same.

**2.** The other defendant is American Family Mutual Insurance Company, which was sued as the alleged joint venturer or employer of American Family Financial Services, Inc. Both defendants are represented by the same counsel. The insurance company makes no effort to justify the result below on the ground that there was a failure of proof of joint venture or employment. In view of the nature of the issues on this appeal and in the interest of simplicity this opinion treats the case as if American Family Financial Services, Inc. were the sole defendant.

alleged that Webb "has been damaged in his good name and reputation and has been exposed to public contempt and ridicule" and has suffered damage "to his business and profession." The petition also alleged that the conduct of defendant was "willful, knowing and intentional." Actual damages in the amount of $100,600 and punitive damages in the amount of $2,500,000 were prayed.

The case was tried to a jury and was submitted on the theories of conversion of the Cadillac and its contents and trespass on Webb's real estate. Instructions concerning actual and punitive damages were given. The jury found in favor of defendant on all issues. Webb appeals.

Webb's points on appeal challenge rulings of the trial court which (a) rejected evidence offered by Webb, (b) admitted, over Webb's objection, evidence offered by defendant, and (c) refused to give a withdrawal instruction offered by Webb.

Webb's first point is that the trial court erred in unduly restricting Webb's right to test the credibility of witness John Gaultier. In 1979 and 1980 Gaultier was employed by defendant as finance manager of its Kansas City office. At the time of the trial Gaultier was no longer in defendant's employ and was working as collection manager for a bank in Independence. While working for defendant, Gaultier had dealings and conversations with Webb in connection with the Webb loan.

Gaultier was called as a witness for *Webb* and underwent extensive direct examination. Webb's counsel then informed the court: "I propose to ask Mr. Gaultier if he misappropriated funds of [defendant]." Before making its ruling the court received information from counsel for both sides. That information was that if the inquiry were permitted, Gaultier would testify that "he was dismissed" by defendant "because of misappropriation of funds" and that

there was no connection "between Gaultier's dismissal and Mr. Webb or any matters in the Webb case." The court refused to permit the inquiry.

■ A witness who is subject to being impeached by the interrogating party, may, under certain restrictions, be asked whether he committed or admitted committing a specific criminal act, even if he has not been convicted of it. See *State v. Stith*, 660 S.W.2d 419, 425 (Mo.App.1983); *State v. Lynch*, 528 S.W.2d 454 (Mo.App.1975).

■ It is unnecessary to determine whether or not the instant record, gauged by the principles stated in *Stith* and *Lynch*, demonstrates an abuse of discretion in not permitting the inquiry. There is an independent reason why Webb may not complain of the trial court's ruling. That reason is that Webb is not permitted "to *directly* impeach" his own witness, *Wells v. Goforth*, 443 S.W.2d 155 (Mo. banc 1969); *Lamb v. Heiligers*, 532 S.W.2d 820 (Mo.App.1975); *Hutchinson v. Steinke*, 353 S.W.2d 137 (Mo.App.1962), and the proposed inquiry, if permitted, would have constituted such impeachment.

■ The general rule is that a party, in either a civil or criminal case, may not discredit or impeach his own witness. *State v. Sutton*, 454 S.W.2d 481 (Mo.1969). "[T]he rule is well-established in Missouri that a party may not directly impeach the credibility of his own witness, even if the witness is an adverse party." *Wells v. Goforth*, supra, at p. 159. In that case the court held that where the witness is the *adverse party*, called under § 491.030,[3] the calling party may impeach the witness by the use of prior inconsistent statements if the adverse party testifies contrary to the prior statements. Even under *Wells*, however, *direct* impeachment of one's own witness remains prohibited.[4]

---

3. All references to statutes are to RSMO 1978, V.A.M.S.

4. For the reasons underlying the Missouri rule see *State v. Kinne*, 372 S.W.2d 62, 67 (Mo.1963). The rule has been criticized. Wigmore on Evidence, Chad.Rev., Vol. IIIA, § 896, p. 658, et seq. See also Fed.R.Evid. 607: "The credibility of a witness may be attacked by any party, including the party calling him." See, however, the limitations, with regard to proof of specific instances of witness's conduct, in Fed.R.Evid. 608(b).

Even if Gaultier had been the adverse party, he could not be directly impeached by Webb, the party who called him. Gaultier was merely a former employee of the adverse party and, a fortiori, he is entitled to the same protection.

It is clear that the proposed inquiry of Gaultier was an effort to "directly" impeach him. In City of *Gallatin v. Murphy*, 217 S.W.2d 400 (Mo.App.1949), the plaintiff called witness Murphy, who was also the defendant. After Murphy testified plaintiff called one Worrell who testified, over the objection of defendant, that the reputation of Murphy for truth and veracity was bad. The court held that the impeachment, being direct impeachment, was improper and reversibly erroneous. Similarly a showing here that Gaultier had misappropriated funds, a criminal act, would constitute direct impeachment. Wigmore on Evidence, Chad.Rev., Vol. IIIA, § 900, p. 666. See also 37 Mo.Law Rev. 507 (1972)— "Impeaching one's own witness in Missouri," and particularly the cases cited in footnote 40 on p. 512. Webb's first point has no merit.

■ Webb's second point is that the trial court erred in receiving into evidence, over Webb's objection, defendant's Exhibits Q, R, S and T. Each of the exhibits was a certified copy of a default judgment against Webb. Webb asserts that the exhibits were not relevant to the issues and were inflammatory. Two of the judgments were entered in 1974 and two were entered in 1976. Three were based on unpaid rent and the fourth was based on an unpaid account. The judgments were in the respective amounts of $325, $695, $900 and $1,484.

Although the exhibits were offered during the presentation of defendant's case, the judgments they represented were first mentioned during the cross-examination of Webb's witness, Bill DeMoss. On direct examination by Webb's counsel DeMoss testified that he was vice president of a Joplin bank. His testimony dealt with the manner in which a person establishes his credit. He discussed the operation of a credit bureau and credit reports. He testified that an involuntary repossession would have an adverse effect upon a person's credit. The witness testified he did not know Webb or Webb's credit history.

On cross-examination by defendant's counsel the witness testified, without objection, that "when you get a credit rating you get a complete readout of a man's credit history, including judgments against him for non-payment of rent or non-payment of a jewelry account and judgments against a person like that would affect his credit rating." Also, without objection, the witness testified that if Webb had judgments against him of the same type as the four questioned exhibits, "that would affect my opinion as to his credit." During that portion of DeMoss's cross-examination, the four judgments were specifically described as to date, amount and basis.

The exhibits were merely cumulative of the witness's testimony on cross-examination and they served to support that cross-examination. On direct examination of the witness Webb's counsel had injected the subject of a credit rating and the impact which an "involuntary repossession" might have upon it. The evidence was properly received as relevant to the credit rating issue and in rebuttal of the witness's direct examination. Webb's second point has no merit.

Webb's third and fourth points will be considered together. Webb's third point is that the trial court erred in denying an oral motion made by Webb's counsel at the conclusion of the testimony of Marlene Coillot who was the first witness for defendant. The motion was that "no further testimony be introduced as to registration and filing of the title application." Webb's fourth point is that the trial court erred in refusing to give Instruction No. A, set forth below,[5] a withdrawal instruction tendered by Webb.

---

5. "INSTRUCTION NO. A

"The issue of whether or not plaintiff completed the registration of the automobile and fur-

Mrs. Coillot was employed as a clerk in defendant's Kansas City office in the summer of 1979. On direct examination she testified that on August 28, 1979, she had a telephone conversation with Webb in which she told Webb it was necessary that he "register the car." The witness said, "He said he was going to register the car this month. We also indicated we needed insurance and our records indicated there was none. Then I put it off 30 days to give him a chance to comply with my communication."

On cross-examination by Webb's counsel, Mrs. Coillot testified, based on a memorandum (introduced by Webb as Exhibit 25) in the Webb loan file, that on September 13, 1979, the witness talked to "Faye" in the Department of Revenue in Jefferson City and Faye "indicated they had our lien perfection and MSO (manufacturer's statement of origin) at Jefferson City.... Our records indicated ... that's what I have in the notation ... that some how it got up there. The customer may have sent it or somebody ... because our records did not indicate at that time that we had sent the MSO or the lien perfection to Jefferson City."

Mrs. Coillot further testified, on cross-examination, that on November 27, 1979, she "talked to Mary in Jefferson City at the Department of Revenue in reference to the Oral A. Webb title. They indicated that at that time they still had the lien perfection and MSO, that our lien was on record, and if the vehicle was ever registered that our lien would be perfected. Their records indicated on that date that the customer, being Mr. Webb, had not registered the vehicle yet. And as we were quite concerned about the title situation Mary indi-

cated to me at that time that 'he, being Mr. Webb, would have to falsify his release of lien to get the title perfected in his own name, which would omit us as the lienholder.'"

At the conclusion of Mrs. Coillot's testimony Webb's counsel cited *Zuke v. Mercantile Trust Company National Association*, 385 F.2d 775 (8th Cir.1967), and stated to the court: "There is no dispute that the lien perfection documents and MSO were filed with the director of revenue in Jefferson City. A lienholder validly perfects his lien on a motor vehicle by paying the required fee and delivering to the director of revenue a lien perfection copy. In view of the testimony of this witness, defendant cannot bootstrap itself by saying that its security is in jeopardy because the lien has now been perfected under the law of the state of Missouri." At that point Webb's counsel made the oral motion.

In *Zuke* [6] one Jackson bought a new automobile from a Missouri dealer and as part of the purchase price executed a negotiable promissory note secured by a security agreement. The note and security agreement were transferred to a lender (Mercantile). In a dispute between Mercantile and Jackson's trustee in bankruptcy [7] the court held that Mercantile perfected its lien on the motor vehicle under § 301.600 by paying the required fee and delivering to the director of revenue an executed lien perfection copy of the Missouri "Multi-purpose Form No. MMV-1" entitled "Application for Missouri Title and/or License," although other copies of the form, which should have disclosed payment of sales or use tax and license registration fee, were not delivered by Jackson to the director of revenue and the automo-

---

nished the title to defendant American Family Financial Services, Inc., is withdrawn from the case and you are not to consider such issue in arriving at your verdict."

**6.** In its opinion in *Zuke* the U.S. Court of Appeals adopted the opinion of the district court, *In re Jackson*, 268 F.Supp. 434 (E.D.Mo.1967). The opinion in *Jackson* discusses Missouri statutes dealing with annual registration of motor vehicles for licensing purposes, (§ 301.020, et

seq.), and the allied, but distinct, process of applications for certificates of ownership of a motor vehicle, (§ 301.190, et seq.).

**7.** In *Matter of Schalk*, 592 F.2d 993, 996, fn. 5 (8th Cir.1979), it is said that the Uniform Commercial Code renders an unperfected security interest subordinate to the claims of intervening lien creditors without notice and that a trustee in bankruptcy is a lien creditor.

bile was never registered for licensing purposes nor was a certificate of ownership issued to Jackson.

One of the requirements under § 301.600 for perfection of a lien on a motor vehicle is the "delivery to the director of revenue" of "the required certificate of ownership fee." Although Webb does not point to any portion of the record showing payment of that fee, Webb's brief in this court states: "[Defendant] undeniably accomplished perfection of its lien in this case.... Defendant relied solely upon the generalized language of the security agreement giving it a right to declare a default and repossess the automobile 'if the secured party feels insecure in his security.' ... Defendant could not, and should not, have had a reason to believe, in December of 1979 or January of 1980, that its security interest was in jeopardy due to [Webb's] failure to obtain title to the motor vehicle."

With certain exceptions not applicable here, § 301.600 provides that a lien on a motor vehicle is not valid *"against subsequent transferees or lienholders* of the motor vehicle who took without knowledge of the lien ... unless the lien is *perfected* as provided in §§ 301.600 to 301.660." (Emphasis added.) Sec. 301.650, par. 2, reads:

"2. The method provided in sections 301.600 to 301.660 of *perfecting and giving notice of liens or encumbrances* subject to sections 301.600 to 301.660 is exclusive." (Emphasis added.)

The instant action is not one between defendant and "a subsequent transferee or lienholder." [8] It is an action between defendant and Webb, who, in the security agreement, "warrants" that he is the owner of the Cadillac. Note that Webb's position is that not only was defendant's lien created, it was perfected.

Sec. 301.620 provides, in pertinent part: "If an owner creates a lien ... on a motor vehicle ...:

"(1) The owner shall immediately execute the application, in the space provided therefor on the certificate of ownership or on a separate form the director of revenue prescribes, to name the lienholder on the certificate, showing the name and address of the lienholder and the date of his security agreement, and cause the certificate, application and the required fee to be delivered to the lienholder;

"(2) The lienholder shall immediately cause the certificate, application and the required fee to be mailed or delivered to the director of revenue."

Since the Cadillac was a new vehicle, no "certificate of ownership" was yet in existence at the time of the making of the loan. Webb failed to comply with the procedure dealing with the use of the "separate form."

An integral part, indeed the heart, of the loan transaction between defendant and Webb, was defendant's check [9] dated July 16, 1979, in the amount of $12,600 payable to Webb and his wife and Porter Cadillac-Buick, Inc. That check was endorsed by all payees and Webb applied the proceeds on the purchase price of the Cadillac. That check (both sides) was introduced by Webb as Exhibit 2. The reverse side of that check contains this provision:

"PAYEES, BY ENDORSEMENT of this check, jointly and severally warrant they immediately will (1) cause [defendant] to be named as the first secured party on either an existing vehicle title *or an application for vehicle title,* for a vehicle being pur-

---

**8.** In *Matter of Estate of Yealick,* 69 Ill.App.3d 353, 25 Ill.Dec. 743, 387 N.E.2d 399 (1979), the court held that lack of perfection of a security interest under the Uniform Commercial Code relates only to priority with respect to other creditors' interests in the collateral. The security agreement between the original parties and the secured party's rights as against the borrower are unaffected by failure to perfect the security interest.

**9.** See *Reese v. First Missouri Bank & Trust Company of Creve Coeur,* 664 S.W.2d 530 (Mo.App. 1984), which cites UCC and non-UCC authorities for the principle that in disputes between the immediate parties, writings executed as a part of the same transaction are to be read together as a single agreement.

chased with this check; (2) send such title *or application* to the necessary office with forms and material necessary to perfect our first security interest in this vehicle." (Emphasis added.)

Other exhibits introduced by Webb dealing with the subject of Webb's failure to register the Cadillac and to obtain issuance of a certificate of ownership were Exhibit 17 and Exhibit 18. Exhibit 17 was a letter from defendant to Webb dated January 11, 1980, in which defendant stated that it had not received "the title" to the vehicle and that it had been informed by the Department of Revenue "that sales tax and registration has not been made." Exhibit 18 was Webb's letter of January 14, 1980, to defendant, in response to the January 11 letter, in which Webb purported to explain his failure to register the vehicle.

As the foregoing demonstrates, most of the evidence dealt with by Webb's motion and Webb's refused instruction was introduced by Webb himself. The central issue in the case was the propriety of defendant's repossession of the Cadillac. Under the security agreement, defendant had the right to repossess [10] "should [Webb] fail to pay any indebtedness hereby secured or the interest thereon when the same becomes due *or* default in any of [Webb's] other obligations or covenants hereunder *or* if [defendant] feels insecure in its security...." (Emphasis added.) Neither in the trial court nor in this court does Webb challenge the validity of any of the foregoing provisions. He merely argues that his motion should have been sustained and the withdrawal instruction given because defendant's lien had been "perfected," and thus defendant had no right to "feel insecure in its security."

Webb's Exhibit 2, the endorsed check, contained Webb's "warrant" that he would immediately cause defendant to be named as the first secured party on either an existing vehicle title [and since this was a new vehicle there was none yet existing] or on an application for a title to the Cadillac and send the application "to the necessary office." Whether the "necessary office," as used in the foregoing endorsement, refers to defendant's office or to the office of the director of revenue, or even whether it is material which office is meant, need not be considered because Webb failed to send an application to either office. Webb, by his own admission, failed to take the steps prescribed with respect to an application.

■■■■ Under § 144.070 Webb, as the owner of a new Cadillac, had a duty, when applying to the director of revenue for a certificate of ownership and the registration of the Cadillac, to pay the sales tax and registration fees and the director could not issue a certificate of title until the tax was paid. Sec. 301.020 required Webb to apply for registration of the Cadillac and, under § 301.190, no certificate of registration could be issued by the director unless Webb had applied for and been granted a certificate of ownership of the Cadillac or presented evidence that such a certificate had been previously issued. Under the latter statute it was unlawful for Webb to operate the Cadillac in Missouri unless a certificate of ownership had been issued.

■■■■ It was uncontested that Webb was operating the Cadillac in Missouri and that defendant knew he was. That operation was an unlawful act. Webb admitted that he had not paid the sales tax. Webb failed to obtain insurance on the vehicle. His dealings with defendant consisted of a series of broken promises. It is unnecessary to determine whether or not defendant's knowledge of the foregoing facts could, reasonably or otherwise, instill in defendant a feeling of being "insecure in its security," [11] although the answer might be obvious. Webb's failure to carry out the responsibilities imposed upon him by the endorsement on the check was "a default

---

10. "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action...." § 400.9–503.

11. See 61 A.L.R.3d 244—"Insecure Creditor—Good Faith Belief."

in any of [Webb's] obligations or covenants hereunder," as provided in the security agreement, and justified the repossession.

 The evidence sought to be attacked by the motion and withdrawn by the instruction was material to the issue of the propriety of defendant's repossession of the Cadillac and the trial court's rulings thereon were eminently proper. Defendant's third and fourth points have no merit. The judgment is affirmed.

GREENE, C.J., and TITUS, J., concur.

CROW, J., disqualified.