STATE of Missouri, Respondent,

v.

Leonard Marvin LAWS, Appellant.

No. 64421.

Supreme Court of Missouri,
En Banc.

Nov. 22, 1983.

Rehearing Denied Dec. 20, 1983.

Robert C. Babione, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BLACKMAR, Judge.

A jury found the defendant guilty of two counts of capital murder and, having expressly found four statutory aggravating circumstances, assessed the death penalty. We affirm the conviction and, after exercising the statutory review mandated by § 565.014, RSMo 1978, sustain the death sentence.

The state relied on the eyewitness testimony of Norman Gilmore, who was a participant in the criminal acts charged but bargained for a 15-year sentence in return for his testimony against his brother George[1] and the defendant. Corroboration was found in admissions by George made to friends and relatives, adopted by the defendant through word and gesture. The defendant does not challenge the sufficiency of the evidence, and so a relatively brief statement of the sordid details of the crime will suffice.

The defendant, in October of 1980, was living in a two-room house trailer along with the Gilmore brothers, George's wife, a sister of the Gilmores, and eleven children. None of the adults was employed, and the group apparently subsisted on one of the women's ADC payments and food stamps. George announced to the adults that he

knew an easier way of making money than working because old people did not trust banks and kept large amounts of money in their homes where they would be easy robbery victims. He then suggested that the victims could be killed so that they could not identify the robbers.

The defendant and Norman, far from objecting, indicated willingness to participate in George's proposed enterprise. The three had made a purchase of shotguns and a rifle on October 8, 1980, and the shotguns were later sawed off. Very early in the morning of October 29 the three headed to the home of Clarence and Lottie Williams, whom the Gilmores had known through an uncle. The defendant was carrying the rifle and the brothers the shotguns. The defendant cut the telephone line, and the three then knocked on the door. The Williams first came out and were ordered back into the house, where the defendant assisted in tying them up in chairs. Defendant threatened to cut their fingers off if they did not tell where their money was concealed. They complied. The robbers then ransacked the house. The Williams were then untied and taken into the bedroom. The defendant suggested that he would hit them in the head with a baseball bat but George told him to go outside and see whether gunshots could be heard. George then shot Lottie once and Clarence twice, killing them. The criminals carried out their loot, loading it into the defendant's and the victims' cars. They next poured oil on the floor and the defendant ignited the oil, starting a fire which substantially destroyed the house. The three then returned to the house trailer with the loot, some of which was left there and identified at trial.

At a later time it was suggested that Norman was talking too much, and the defendant said that he would have to be disposed of, "brother or no brother." George and the defendant expounded rather freely to friends and relations about what they had done, with George doing

---

1. *State v. Gilmore,* 650 S.W.2d 627 (Mo. banc 1983) (Gilmore I), involves the same incident and includes a statement of further facts. The case was reversed and remanded because of insufficiency of the indictment.

most of the talking while the defendant was present and manifesting agreement. Two of the hearers, out of fear, reported to the police and aided in setting up George and the defendant for a police ambush on January 1, 1981, and they were apprehended following a chase.

### 1. *The Guilt Phase*

■ When the defendant was arrested he was advised of his *Miranda* rights and presented with a written waiver form. He initialed the enumerated rights but did not sign the waiver. The attending officer testified that the defendant "indicated that he knew that he was going to die for what he had done but he was going to make me work for it." Objection was taken and preserved, and the defendant now argues that the officer's testimony contained an improper revelation that the defendant had elected to exercise his privilege against self-incrimination.

We do not agree with this contention. The defendant was properly alerted as to his rights regarding statements to the police and willingly made a statement strongly probative of his guilt. He knew, after the warning, that he spoke at his own risk. The statement was much more than a mere claim of privilege, and the jury should not be denied the benefit of probative evidence simply because the defendant indicated awareness of his right to remain silent.[2]

The totality of the evidence against the defendant, furthermore, is very strong, with admissions and the finding of the loot providing corroboration for the testimony of the very depraved eyewitness.

■ The defendant, in a pro se brief, challenges the "death qualification" of the jury, pursuant to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). It is first suggested that a jury from which all persons who affirm that they could never vote for a death sentence have been removed is "prosecution prone," and incapable of rendering a proper verdict on any phase of the case. This contention has been expressly rejected. *State v. Stokes,* 638 S.W.2d 715, 722 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983); *State v. Mercer,* 618 S.W.2d 1, 8 (Mo. banc 1981), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

■ The defendant also argues that venireman Barfield was improperly excused for cause, suggesting that he said that he could consider death in "some of the very worst [cases] in our history." His actual answer was that he could not consider the death sentence. This answer was sufficient for excuse for cause, especially in the absence of an express objection.[3] *See State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983).

---

**2.** Affirmative and voluntary admissions to crimes have been held admissible in a number of cases, in both Missouri and other jurisdictions, presenting essentially identical facts. *See, e.g., United States v. Valle,* 644 F.2d 374 (8th Cir.1981) (Statement made by defendant to Secret Service agent while he was incarcerated and fully advised of his *Miranda* rights was voluntary and, statement was properly admitted at his trial); *State v. Stewart,* 542 S.W.2d 533 (Mo.App.1976) (Admission against interest voluntarily made by defendant while under arrest for possession of marihuana and after he had been advised of his rights was properly admissible); *State v. Finn,* 111 Ariz. 271, 528 P.2d 615 (banc 1974) (Admission into evidence of defendant's response to officer's question, did not contravene defendant's Fifth Amendment right to remain silent, where he was informed of his *Miranda* rights and there was no evidence of duress); *Antone v. State,* 382 So.2d 1205 (Fla.1980), *cert. denied,* 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980) (Defendant's

voluntary statements made after the administration of *Miranda* warnings were voluntary and admissible); *State v. Stilling,* 285 Or. 293, 590 P.2d 1223 (1979) (Testimony by a detective was not an improper use of defendant's assertion of his Fifth Amendment privilege to remain silent, since testimony was not used to show defendant's refusal to talk but rather to show what he admitted).

**3.** Venireman Barfield was properly excused for cause because of the following responses made on voir dire examination by the State:

Mr. Goldman: . . . do you have some feelings you think would prevent you from returning a death verdict?
Venireman 17: Religious belief.
Mr. Goldman: . . . And is what you are telling me, sir, that regardless of what the evidence might be in the case you still have this religious belief that would not let you vote for the death penalty?

The defendant next complains of the giving of MAI–CR2d 3.52 at the conclusion of the evidence, as a part of the Court's general charge.[4] Norman Gilmore was the only witness who was impeached by prior inconsistent statements. He testified at trial that the plan from its inception contemplated the killing of the victims so that they would not identify the criminals, and the defense showed that, when his guilty plea was received, he indicated that the killings had been an afterthought. The impeaching testimony went in without objection or request for limiting instruction. The defendant now argues that it became available as evidence in the case for all purposes, and that the giving of 3.52 deprived the defendant of the right to have the inconsistent statements considered as substantive evidence.

The Attorney General represents that the instruction was requested by defense counsel, but the record does not show this. Counsel, of course, are responsible for seeing that the trial proceedings are recorded accurately, and that the instructions show which side requested them. In the absence of an appropriate record we can only assume that the court gave the instruction on its own motion. So considered, we perceive no error and no prejudice.

We are not prepared to accept the proposition that the court erred in giving the limiting instruction at a later time, simply because it was not requested or given at the time the impeaching evidence was offered. The limitation was as logical at the conclusion of the case as at any other time.[5] The court might well have refused a belated request, but should not be held in error for giving a correct instruction. The defendant did not acquire a right to have the evidence considered beyond its proper purpose simply because there had been no contemporaneous attempt at limitation.

There is, furthermore, no discernable prejudice from the giving of the instruction. The defendant had no burden of establishing any fact. The prosecution, rather, had to persuade the jury that Norman's testimony was worthy of belief. If the jury chose to disbelieve or discredit Norman because he had said something different on a previous occasion, then the showing of the inconsistent statement would have had its effect, whether considered as impeaching evidence or substantive evidence. The jury apparently accepted Norman's trial testimony. It strains the imagination to think that its view would have been different if 3.52 had not been given.

The defendant next argues that the jury should have been instructed on "conspiracy to commit murder" as a lesser included offense. The point is not well taken. An offense is not lesser and included if it contains any element which is not a part of the greater offense. An essential

---

Venireman 17: That's correct.
Mr. Goldman: ... So if you had a choice of those two options, death or life without parole for fifty years, you are saying you would never vote for the death penalty?
Venireman 17: No.
The trial judge apparently construed the last answer as intending to say, "No, I would never vote for the death penalty," rather than as denying the prosecutor's assertion that he would not do so. This is an appropriate construction, in a situation in which manner of expression would be significant, and is all the more so because defense counsel did not seek clarification, nor object to the excuse of the juror.

4. The trial court gave MAI–CR2d 3.52 (1979) at the conclusion of the evidence as part of its general charge, as follows:

If you find and believe from the evidence that on some former occasion a witness made a statement inconsistent with his or her testimony in this case, you may consider such evidence for the purpose of deciding the believability of the witness and the weight to be given to his or her testimony. However, in deciding the guilt or innocence of the defendant, any prior statement of the witness must not be considered by you as evidence of the matters contained in the statement.

5. Federal Rule of Evidence 801(d)(1) refers to the use of prior inconsistent statements for impeachment purposes. The Advisory Committee notes to the rule recognize that "prior inconsistent statements traditionally have been admissible to impeach but not as substantive evidence." Missouri law is still in accord with this traditional approach.

element of conspiracy is agreement.[6] Agreement is no part of the substantive offense of capital murder, even when the offense is committed by several persons in collaboration. An instruction on conspiracy, far from being required, would have been absolutely improper because it would have permitted the conviction of the defendant for an offense not charged.

■ The next complaint has to do with the prosecutor's argument about "instructing down," in which he said:

Because [the court] instructs down does not mean that he believes this any more than the other ones....

Objection was promptly made, and the court responded as follows:

"Well, I will sustain the objection to the way you phrased that, what the court may or may not believe, and instruct the jury to disregard that portion."

There was no motion for mistrial. The court granted the only relief asked for. The remark, furthermore, was not of such consequence as to impede the jury's proper consideration of the case.

■ Other complaints are made about the closing arguments, at both phases of the trial. No objections were taken to these. They are not of sufficient gravity to support a claim of plain error, or as to impose on the court a duty of intervening in the absence of objection. *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

The first phase of the trial was free of any substantial or prejudicial error, and the conviction on each count is affirmed.

### 2. *The Punishment Phase*

The defendant claims that there was no jurisdictional foundation for the second stage of the trial or for the admission of evidence in aggravation, because no notice of aggravating circumstances pursuant to § 565.006(2), RSMo Cum.Supp.1982, was filed after the filing of the information on which the case was tried. An appropriate notice, and amended notice, were filed after the return of the initial indictment, but this indictment was invalid because it omitted the element of deliberation. *See State v. Gilmore, supra,* note 1. Defendant argues that this notice was a nullity because of the invalidity of the indictment.

■ We reject the claim. The purpose of the notice of aggravating circumstances is just what the title implies—to give notice. Defense counsel, by moving to strike the notice which was filed, show that they were aware of the claimed aggravating circumstances. Had objection been made about the time of filing a new identical notice could have been filed. The requirement of notice is purely statutory. We see no reason for holding that the time of giving notice is jurisdictional.

■ Counsel eloquently argues that we should depart from prior holdings such as *State v. Newlon, supra,* and should hold that the imposition of capital punishment constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States, and Article I, Section 21 of the Constitution of Missouri. It is argued that the "standardless discretion" which caused the Supreme Court of the United States to invalidate all or substantially all of the existing death penalty statutes in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), still remains, in spite of the attempt in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and companion cases, to indicate the kind of standards the Supreme Court might be willing to accept. This Court is not willing to depart from its prior holdings, or to invalidate the statute which was borrowed in its essentials from Georgia and

6. Section 564.016, RSMo 1978, provides the following definition of conspiracy:

1. A person is guilty of conspiracy with another person or persons to commit an offense if, with the purpose of promoting or facilitat-

ing its commission he *agrees* with such other person or persons that they or one or more of them will engage in conduct which constitutes such offense. (Emphasis supplied).

which appears to comply with the *Gregg* requirements.[7]

The defense next argues that the death sentence in this case is constitutionally invalid because of the 15-year sentence imposed on Norman Gilmore following his undertaking to testify for the state. Counsel argues that Norman's culpability was substantially greater than defendant's, and comparable to that of George. It is common prosecutorial practice to enter into a bargain with a criminal in exchange for testimony against other accused persons.[8] There is no requirement that the bargain be offered only to a person who appears to be less blameworthy than the persons against whom he proposes to testify. Norman was the only one of the three robbers who came forward with an offer of testimony in exchange for lenient treatment. He was the only eyewitness who testified. Had he remained silent, there might have been no conviction at all for a shocking crime, or the juries might have compromised their findings on account of uncertainties. There is no basis for criticizing the discretion the prosecutor exercised in this case, or for holding that, by bargaining with Norman, the state lost the right to try the defendant and George for capital murder.

We now turn to the independent review the sentence mandated by § 565.014, RSMo 1978.

The defendant had a fair trial, free from prejudicial error, as our holdings on the several points urged for reversal show. None of the prosecution's unobjected argu-ments during the penalty phase is of sufficient inflamatory tendency to indicate that the verdicts were reached as the result of passion and prejudice, and nothing else indicates that they were so flawed.

At least three statutory aggravating circumstances as defined in § 565.012, RSMo Cum.Supp.1982, and found by the jury were soundly established by the evidence, as follows:

(1) "The defendant has a substantial history of serious assaultive convictions." (Sec. 565.012.2(1)). These include two convictions of armed robbery on pleas of guilty in Arizona in 1971, a conviction for aggravated assault in Mississippi in 1974, and two convictions for capital murder in Missouri in 1981 and 1982.[9]

(2) "The murder of each victim was committed while the defendant was engaged in the commission of the capital murder of the other victim." (Sec. 565.012.2(2). This portion of the statute is so worded that there might be some confusion as to "which came first" in another setting, but here the evidence shows overwhelmingly that the robbers, when planning the crime against the Williams, intended to kill both of them from the outset, and it can accurately be said that each murder was committed in the course of committing the other.

(3) "The defendant murdered both Lottie and Clarence Williams for the purpose of receiving money or any other thing of monetary value." (Sec. 565.012.2(4)). The sole purpose of the invasion of the Williams

---

7. The writer is not lacking in sympathy for the argument presented, but follows the recent and substantially unanimous decisions of this Court.

8. *Gregg v. Georgia,* 428 U.S. 153, 199–200, 96 S.Ct. 2909, 2937–2938, 49 L.Ed.2d 859 (1976), takes note of this practice and states that it is not an obstacle to capital punishment.

9. *Compare Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386 (1976), where the Georgia Supreme Court declared unconstitutional the aggravating circumstance of "the offense of murder . . . was committed by a person . . . who has a substantial history of serious assaultive criminal convictions." Ga.Code Ann. § 27–2534.-1(b)(1). The court determined that this aggra-vating circumstance was too vague to be constitutional.

This Court, however, has upheld a conviction where "serious assaultive criminal convictions" was the aggravating circumstance. *See State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983). *See also State v. Holtan,* 197 Neb. 544, 250 N.W.2d 876 (1977), *cert. denied,* 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198 (1977), where language in the Nebraska capital murder statute very similar to that discussed in *Arnold* was held to be constitutionally valid, and concurring opinion of Higgins, J., in *Stokes.*

residence was monetary gain. The killings were simply designed to facilitate the enjoyment of the stolen money and property. Our decisions hold that deliberate homicide in the course of a robbery is a killing for the purpose of "receiving" value within the meaning of the statutory subsection. *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983);[10] *State v. Stokes*, 638 S.W.2d 715 (Mo. banc 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983).

 Inasmuch as these three statutory aggravating circumstances were amply supported by the evidence, we need not decide whether the "outrageously or wantonly vile" aggravating circumstance defined in § 565.012(4) was proper under the evidence in this case, or whether it was submitted in accordance with the standards of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Our cases hold that there is no prejudicial error in submitting an aggravating circumstance to the jury even though the circumstance is not sufficiently defined to provide appropriate guidance, or is not supported by the evidence, if other properly supported circumstances are found.[11] This Court rejects attempts to draw an analogy to "overinstructing" in civil cases, and the suggestion that the jury might not have specified a death sentence if it had not been instructed that it should consider an improperly assigned aggravating circumstance. The Supreme Court of the United States has sustained convictions which present the same problems.[12]

 If we are to have capital punishment, there is nothing concerning this offender or his crime which presents any rea-

son for mitigation. The defendant and his companions willfully took the lives of an elderly couple, so as to avoid detection and be better enabled to enjoy the fruits of the robbery after fencing the stolen property. Nothing indicates that the defendant was under any psychological constraints or that he was particularly subject to the control of others.[13] Cf. *State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982). The jury's conclusion that the killings were contemplated from the inception of the plan is overwhelmingly supported by the evidence. The defendant was a willing participant from the beginning and played his assigned role by cutting the telephone line, tying the victims, threatening them, serving as lookout during the shootings, and torching the dwelling. Testimony about his expression shows no indication of regret, compassion or remorse, at least while he was free. It is of no significance that he did not fire the fatal shots.[14]

As for the required comparison, little can be added to the discussion in *State v. Gilmore*, 661 S.W.2d 519 (Mo. banc 1983) (Gilmore II), decided contemporaneously, and the cases there cited.

The judgment is affirmed.

All concur.

Execution date set for January 6, 1984.

---

**10.** The writer does not agree on this point, as explained in his Dissenting Opinion in *State v. McDonald, supra,* but here follows the Court's opinion in *McDonald.*

**11.** *State v. LaRette*, 648 S.W.2d 96, 102 (Mo. banc 1983); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981).

**12.** *See,* e.g., *Zant v. Stephens*, —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), where the Court held that respondent's death sentence was not impaired on the asserted ground that the jury instruction with regard to the invalid statutory aggravating circumstance

may have unduly affected the jury's deliberations.

**13.** The defendant offered no evidence at either stage of the trial.

**14.** *Enmund v. Florida*, —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), suggests that punishment ought to be proportionate to moral guilt, and set aside the conviction of a participant who was not the triggerman. In *Enmund,* however, there was an absence of proof that the defendant killed, attempted to kill, or intended to kill.