STATE of Missouri,
Plaintiff-Respondent,

v.

Elroy PRESTON, Defendant-Appellant.

No. 64186.

Supreme Court of Missouri,
En Banc.

May 15, 1984.

Rehearing Denied June 19, 1984.

Certiorari Denied Oct. 9, 1984.
See 105 S.Ct. 269.

Henry B. Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

GUNN, Judge.

Defendant stands convicted of one count of capital murder and one count of second degree murder. The death penalty was assessed by the jury for the capital murder conviction based on the finding of the statutory aggravating circumstance of the offense being "outrageously or wantonly

vile, horrible or inhuman in that it involved ... depravity of mind," § 565.012.2(7), RSMo Cum.Supp.1983. A consecutive life sentence was assessed by the trial court for the second degree murder conviction.

A substantial number of alleged errors are raised by defendant's counsel. These include: 1) allowing the state to impeach its own witness; 2) refusing to allow evidence of an unrelated incident which theoretically could have affected defendant's state of mind and thereby provoked defendant into the killings; 3) refusing to allow leading questions of a purported state's witness; 4) permitting disparaging remarks of the prosecutor concerning the defense of mental disease or defect; 5) refusing to give defendant's tendered instruction on mental disease or defect which would in this particular instance allow a finding of mental disease or defect when defendant was drunk; 6) questioning veniremen on voir dire about the death penalty; 7) failing to include as a mitigating circumstance in the penalty phase an instruction that defendant had a mental disease or defect; 8) allowing evidence of a nonstatutory aggravating circumstance of a suspended imposition of sentence; 9) permitting an improper prosecutorial argument; 10) insufficiency of evidence to support the statutory aggravating circumstance of depravity of mind; and 11) excessiveness of penalty as compared to similar cases.

No error appears, and the convictions and penalties assessed are affirmed.

A get-together between friends and relatives is the start of the episode leading to this capital murder case. It ends in brooks of blood and some grizzly happenings. The *dramatis personae* of this crime are defendant, his brother, Ervin Preston, defendant's girlfriend, Sherry Brown, and the victims, Pee Wee Richardson and Betty Klein. The place of the killings is Ervin's North St. Louis home.

Defendant had been living temporarily with his brother Ervin in the downstairs portion of the house. Ervin was a paraplegic confined to a wheelchair. Pee Wee Richardson and Betty Klein lived together upstairs. All were present in Ervin's quarters for an evening's heavy drinking, save for Sherry Brown who did not imbibe. During the course of the night, frequent alcohol-related verbal vituperations were exchanged between the three men for a farrago of petty reasons, including who was to sleep where and whether some chicken which had been purchased to sate hungry stomachs would be permitted to be shared with Pee Wee Richardson.

Pee Wee and his bedmate, Betty Klein, ultimately went upstairs for some sleep, with defendant from time to time interrupting their slumber with trips to their room. Angry for a continuing assortment of grounds, defendant made a final trip upstairs and ordered Pee Wee and Klein to Ervin's downstairs quarters. In the presence of Ervin and Sherry Brown, defendant announced to the hapless Pee Wee and Betty Klein that he would kill them just as soon as he removed his clothes. Presumably, the idea behind the clothes removal was to keep from having them blood spattered. True to his word, defendant did take off all his clothes, and proceeded to stab and critically wound Pee Wee with a hunting knife. Then with a single swipe of the knife he severed Betty Klein's spinal cord at the neck, killing her instantly. He immediately returned his attention to Pee Wee and stabbed him several more times in the chest and abodomen. Pee Wee died as a result of five stab wounds to the body, face and hands, the latter coming as he tried to ward off the lethal blows. He also absorbed four incised wounds. The killings complete, the defendant took some leftover fried chicken, dipped it in the victims' blood and ate it with relish, all the while aiming deprecatory remarks at his stone dead victims. With this bizarre bit of action completed, defendant and Sherry Brown dragged the bodies to a back alley and left them there to be discovered by neighbors. He and Ms. Brown then made some effort to clean the blood spattered house.

Defendant was convicted of the capital murder of Pee Wee Richardson and sentenced to death, the statutory aggravating

circumstance of the offense being "outrageously or wantonly vile, horrible or inhuman in that it involved ... depravity of mind," § 565.012.2(7), RSMo Cum.Supp. 1983. He was also convicted of second degree murder for the killing of Betty Klein and given a consecutive life sentence as a dangerous offender for that crime.

### I.

 Defendant's first point deals with alleged error in permitting the state to impeach its own witness, Sherry Brown, defendant's girlfriend.

As part of its case, the state did call Ms. Brown, who, during redirect examination either denied or could not recall having made certain statements to police during the investigation of the crime. At the prosecutor's urging that Ms. Brown was evasive and inconsistent in her answers and was a hostile witness, the trial court allowed leading questions of her and an attempt to refresh her memory by reviewing a transcript of a taped statement made by her to police.

There was no error in this. It is a basic legal tenet that when a state's witness is equivocal, uncertain or evasive or the witness is forgetful or unwilling, reference during redirect examination to a statement prior to trial is proper. *State v. McKinney*, 475 S.W.2d 51, 54 (Mo.1971). "It is competent to exhibit to a witness a statement made by her prior to her testimony at trial, for the purpose of refreshing the witness' recollection, and such is not impeachment." *State v. Couch*, 567 S.W.2d 360, 362 (Mo.App.1978), *quoting Coats v. Old*, 237 Mo.App. 353, 167 S.W.2d 652, 655 (1942). Refreshment of memory generally is in the domain of trial court discretion, *State v. Couch*, 567 S.W.2d at 362, and is reviewable only for abuse. *State v. Crow*, 486 S.W.2d 248, 257 (Mo.1972).

In any event, Ms. Brown by her actions did establish herself as a witness hostile to the state. She continued to exhibit her steadfast loyalty and devotion to the defendant and reluctance to testify against him. In fact, though under subpoena, her

appearance was only as a consequence of her arrest. In that circumstance the redirect examination by the prosecutor—more in the nature of cross-examination by sharp and leading questions—was not improper or an abuse of discretion. *State v. Crone*, 399 S.W.2d 19, 22 (Mo.1966); *State v. Kinne*, 372 S.W.2d 62, 66 (Mo.1963); *State v. Woolford*, 545 S.W.2d 367, 373 (Mo.App. 1976). The examination was not a direct impeachment of the state's own witness, of course, which is impermissible. *State v. Armbruster*, 641 S.W.2d 763, 766–67 (Mo. 1982); *State v. Sutton*, 454 S.W.2d 481, 488 (Mo. banc 1969); *Wells v. Goforth*, 443 S.W.2d 155, 159 (Mo. banc 1969); *Webb v. American Family Finance Services*, 667 S.W.2d 435 (Mo.App.1984). *See also* Comment, *Impeaching One's Own Witness in Missouri*, 37 Mo.L.Rev. 507 (1972).

### II.

 Defendant's second point concerns the exclusion of certain testimony sought to be elicited from Ervin Preston and Ms. Brown which would bear on defendant's state of mind at the time of the killings.

The defendant maintains that at some point during his youth, Ervin, his brother, had raped him. This incident came to his mind on the night of the killings. As part of the *res gestae*, and not for the truth of the matter, defendant's counsel sought to question Ervin and Ms. Brown whether defendant, in a highly agitated state of mind, had related the humiliating experience with his brother. Defendant's purpose, of course, was to establish that he was in a heated frame of mind, which would bear on his defense of mental disease or defect and also go to deliberation and malice.

The trial court sustained objections on ground of relevancy, and no error appears in this action. It is difficult to perceive the pertinence of defendant's attitude toward his brother from a long past experience and the killing of two unrelated and totally disconnected persons. The circumstance of a suggested homosexual relationship and bitterness toward his brother is not germane or part of the *res gestae*, as it is not

connected with the main fact of the killings. *See State v. Sherman*, 637 S.W.2d 704, 706 (Mo. banc 1982). No need exists for tampering with the trial court's substantial discretion in this issue of relevancy and determination of weight and probative value of the testimony. *State v. Clark*, 652 S.W.2d 123, 128 (Mo. banc 1983).

### III.

■ Defendant next complains that his trial counsel was denied the opportunity to cross-examine Ms. Brown by the use of leading questions.

Discussion above has been completed on the issue of Ms. Brown's hostility to the state and bias for defendant. In that circumstance, it is proper for the trial court to exercise its control over the examination of witnesses to the extent of allowing leading and suggestive questions even on direct examination. *State v. Britton*, 647 S.W.2d 155, 160 (Mo.App.1982). But the reverse circumstance to which this point is directed also requires control by the trial court in the use of leading questions. That is, when the witness is on cross-examination and is obviously biased in favor of the cross-examiner, leading questions can pose a substantial danger and certainly may be restricted or forbidden entirely. 3 J. Wigmore, Evidence §§ 773 and 774 (1970). In effect, by her hostile response to the state, Ms. Brown became a witness for defendant, *State v. Armbruster*, 641 S.W.2d at 767, thus subject to procedural limitations on questioning. *See State v. Sanders*, 661 S.W.2d 52, 53 (Mo.App.1983) (holding that the trial court has substantial discretion in determining the scope and content of cross-examination in criminal proceedings).

*State v. Murphy*, 338 Mo. 291, 90 S.W.2d 103 (1936), relied on by defendant for the proposition that a cross-examiner may ask adversary witnesses leading questions about affirmative defenses, does not give him aid. In *Murphy* there was no evidence that the "adverse" witnesses were hostile to the state or biased in favor of the defense. In any event, as stated in *Murphy*, *id.* at 110, when the defendant subsequently calls the witness as his own and is given fair opportunity to present his side through the witness, no prejudice occurs. In this instance defendant did call on Ms. Brown and was able to present through her direct testimony all that he sought from his abortive cross-examination. But the consequence of limiting leading cross-examination in this case differs mightily from *Murphy*, for in *Murphy*, defendant was not permitted to fully present his side of the case from either a direct or cross-examination of the state's "non-hostile" witnesses. *Id.* at 110–11. That is not the situation in this case.

### IV.

Defendant next argues that the prosecution improperly disparaged the defense of mental disease or defect.

Specifically, defendant refers to the prosecutor's interrogation of Ms. Brown during his "cross-examination" of her whether she and defendant had discussed using an insanity plea "to beat the case". The defendant also complains of the prosecutor's comment during an objection that the defendant's counsel "is painfully aware of the inadequacy of that law"—referring to the defense of mental disease or defect excluding responsibility. Finally, he chafes at the prosecutor's closing argument in which the comment was made that a finding in favor of defendant's asserted defense would allow him "to walk out the door."

■ In asserting this defense, defendant has much to overcome, for the trial judge has much discretion in controlling argument and comment of counsel. *State v. Davis*, 653 S.W.2d 167, 176 (Mo. banc 1983); *State v. Newlon*, 627 S.W.2d 606, 616 (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982), *reh'g denied*, 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982).

■ Inquiry of Ms. Brown as to whether defendant had discussed with her the possibility of fabricating the defense of insanity as a way of prevailing against the charges was a proper line of inquiry. *State v.*

*Hoyel*, 534 S.W.2d 266, 269 (Mo.App.1975). No error appears here.

■ The comment about the "inadequacy of the law" is viewed in the light of plain error, as there was no objection to it. Though scarcely a compliment, in its context, the remark is substantially more subtle than comments rising to "prejudicial appeals to the juries' fears and apprehensions that a successful mental defect or disease defense would result in the release of the accused and the commission of future antisocial acts." *State v. Davis*, 653 S.W.2d at 177, (*quoting State v. Mensah*, 625 S.W.2d 135, 137 (Mo.1981)). The comment of the prosecutor in this instance did not call for mistrial *sua sponte.* There was no abuse of trial court discretion in failing to do so. *State v. Davis*, 653 S.W.2d at 176. It is truly not an opprobrious reference to mental disease or defect as a defense, and any possible adverse effect was properly ameliorated by the trial court's directing the jury's attention to the instructions. *See State v. McIlvoy*, 629 S.W.2d 333, 340 (Mo. banc 1982).

■ For the same reasons set forth immediately above, the "walking out the door" comment made by the prosecution in closing argument does not call for mistrial *sua sponte.*[1] This is so even with regard to defendant's asserted argument that the statement contains a misrepresentation or misunderstanding of the distinction between the defenses of diminished capacity and mental disease or defect. The jury received proper and adequate instruction in

that regard. And it is presumed that the jury will properly follow the instructions as given. *Cunningham v. Thompson*, 277 S.W.2d 602, 611 (Mo.1955); *Callaway v. Lilly*, 605 S.W.2d 155, 159 (Mo.App.1980).

There was no abuse of the trial court's discretion in determining the permissible scope of counsel's argument to the jury. *State v. Davis*, 653 S.W.2d at 176.

■ Defendant aims another complaint at the prosecutor's closing argument during the punishment phase of the bifurcated proceedings. The prosecutor in urging the death penalty directed the jury's attention to a New York case in which a former protege of a well known author had killed someone after having been released on parole. Defendant urges that this type of argument is fulsomely unfair in its intent to link defendant with other notorious killers and its inference that he will kill again if paroled.

However, the record fails to disclose that the prosecutor's statements made direct connection between the defendant and the New York case in regard to any similarities of the crimes or punishments.[2] "It has long been recognized that the prosecutor is permitted to argue such propositions as the prevalence of crime in the community, the personal safety of its inhabitants, and the jury's duty to uphold the law as well as inferences from its failure to convict ...." *State v. Newlon*, 627 S.W.2d at 619.

Furthermore, in murder prosecutions, counsel is given wide latitude in arguing

1. The "walking out the door" statement is embraced in the following portion of the prosecutor's closing argument:

 [Prosecutor] You know, it [instruction on diminished capacity] says, if you got a mental disease or defect and that causes you not to form, you know, the right intent or whatever it is, then, you find him not guilty. It doesn't say, you send him to wherever we're going to send him to. He is—it finds you not guilty. *What's not guilty to you? It means to me, he walks out there on out the door on that charge.*

 MS. ADLER [Defendant's counsel]: What's that instruction?

 MR. MOSS: It's the diminished responsibility, MAI–CR [3.] 74. Okay. Now, the same

things are true of murder second degree, if you find he has a mental disease or defect and he couldn't form the right kind of thinking on this thing, you—you walk him out the door. You don't send him up to Fulton or whatever or Farmington, you walk him out the door and I don't know, how you change that, you know, that's what happens. (Emphasis added.)

2. *See State v. Lee*, 654 S.W.2d 876 at 879–80 (Mo.1983), regarding insignificance to existing trial of notorious but unrelated incidents; *e.g.,* assassination attempt on President Reagan and assassinations of Dr. Martin Luther King, Jr. and Senator Robert Kennedy.

punishment. *State v. McDonald,* 661 S.W.2d 497, 506 (Mo. banc 1983). How far counsel should be permitted to go outside the record to talk about other specific crimes for the purpose of illustration and argument is within the discretion of the trial court. *State v. Brown,* 360 Mo. 104, 227 S.W.2d 646, 652–53 (1950). No abuse of that discretion occurred here.

## V.

■ Defendant suggests error in the given instruction defining the term "mental disease or defect." The pertinent portion of the instruction which brings forth defendant's complaint provides:

The phrase "mental disease or defect," as used in these instructions, means any abnormality, regardless of its medical label, origin or source except *alcoholism without psychosis.* (Emphasis added.)

This instruction follows MAI–CR2d 2.32. But defendant contends that the emphasized portion should not have been included in the instruction, for his defense was that he suffered mental disease or defect when drinking. There is no legitimate basis for defendant's argument in this regard.

Defendant's girlfriend, Sherry Brown, testified that when defendant consumed alcoholic beverages, he became "mentally sick" and "crazy." And there is plenty of evidence that a substantial amount of liquor had been drunk by everyone, except Ms. Brown. But it is equally apparent that Ms. Brown was not qualified as an expert in the diagnosis of psychosis. *State v. Shipman,* 568 S.W.2d 947, 951 (Mo.App. 1978). *See Varley v. General American Life Insurance Co.,* 664 S.W.2d 682, 683 (Mo.App.1984), setting forth the bases on which a lay witness may express opinion as to sanity of a person.

The notes on use to MAI–CR2d 2.32 require the insertion of the "alcoholism without psychosis" phrase "if there is evidence justifying reference to" it. There was strong evidence here of defendant's heavy drinking before the killings, which would bring into play whether there was alcoholism with or without psychosis. That, in fact, is the ultimate jury issue, based on defendant's theory of defense that he suffered a psychosis because of his bibulousness. It is also the ultimate jury issue delineated by § 552.030.7, RSMo Cum. Supp.1983. The intent of the instruction is to allow the jury to determine whether defendant suffered from psychosis because of his alcohol consumption. Merely being in a state of drug or alcohol intoxication does not provide a recognizable defense under the law unless it has resulted in psychosis. *State v. Ingram,* 607 S.W.2d 438, 441 (Mo.1980); *State v. Shipman,* 568 S.W.2d at 950. Section 552.010, RSMo 1978 specifically says so.

■ The defendant's behavior was indeed bizarre. But that fact does not necessarily bespeak that he had a mental disease or defect excluding responsibility or that he was psychotic. *State v. Thomas,* 625 S.W.2d 115, 124 (Mo.1981), *cert. denied,* 459 U.S. 1114, 103 S.Ct. 747, 74 L.Ed.2d 966 (1983). Neither does the fact that Ms. Brown thought defendant to be "crazy" require the jury to find that he was, nor does competent expert testimony on the psychosis issue compel the jury to accept such testimony. *State v. Lee,* 654 S.W.2d 876, 880–81 (Mo. banc 1983).

*State v. Smith,* 649 S.W.2d 417 (Mo. banc 1983) provides apt summation for the propriety of including the "except alcoholism with psychosis" language in situations in which the drinking of intoxicants is a part, for the circumstances of that case are similar to those here:

When there is evidence of alcoholism or drug abuse without psychosis or antisocial behavior *and* evidence of mental disease or defect, ... the parenthetical matters in MAI–CR 2.32 serve to clarify the law for the jury by distinguishing between these conditions.

*Id.* at 432.

## VI.

■ Defendant's next point is concerned with the disqualification of the venirepersons who stated categorically during

voir dire that they would be unable to impose the death penalty regardless of the evidence. He argues that the striking of such jurors makes for a jury prone to finding for the state. *State v. Guinan*, 665 S.W.2d 325 (Mo. banc 1984), specifically answers this point, holding that the systematic removal of persons who are unable to follow the law as to punishment does not deny the defendant the right to a representative jury nor leave a panel which is "less than neutral with respect to guilt." *Id.*, at 329–330.

There is worthy reason for the holding of *Guinan:* the removal of the jurors is not because they are members of a class. Rather, they are disqualified for the traditional reason that they cannot agree to try the issues presented on the evidence and law. *Grigsby v. Mabry*, 483 F.Supp. 1372 (E.D.Ark.1980), *modified*, 637 F.2d 525 (8th Cir.1980), 569 F.Supp. 1273, 1287 (E.D.Ark. 1983).

Defendant also alludes to having a separate sentencing jury. But Missouri's statutory scheme of providing for a single jury to determine guilt and punishment in a bifurcated trial has been held to be constitutionally sound. *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984); *State v. Guinan, supra.*

### VII.

Pertaining to the penalty phase, defendant offered, and the trial court gave, an instruction patterned after MAI–CR2d 15.44 on the submission of mitigating circumstances. The instruction given at defendant's request provides:

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 32, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murder of Willie Richardson.

You may also consider:

1. Whether the murder of Willie Richardson was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. The age of the defendant at the time of the offense.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

On appeal and under plain error, defendant urges that the instruction does not list as a mitigating circumstance that he had a mental disease or defect as referred to in Notes on Use No. 4 to MAI–CR2d 15.44.

■ There is a bevy of qualitative deficiencies to this point. First, the instruction was given at defendant's request. Although it is natural that there was no objection to it by him at any time, the consequence is that the point has not been preserved for review of any error. *State v. Martin*, 620 S.W.2d 54, 55 (Mo.App.1981).

■ Also, as the instruction was given at his behest, defendant is not in a position to lodge meritorious complaint about its being prejudicial to him or erroneous. *State v. Euell*, 583 S.W.2d 173, 178 (Mo. banc 1979); *State v. Wilson*, 607 S.W.2d 751, 752 (Mo.App.1980).

■ The test of plain error regarding instructions is that the trial court must have so misdirected or failed to instruct the jury on the law of the case as to cause manifest injustice. *State v. Lee*, 654 S.W.2d at 878; *State v. Thomas*, 664

S.W.2d 56, 59 (Mo.App.1984); Rule 29.12(b). In this instance no manifest injustice occurred by the giving of defendant's instruction. The only, and certainly insubstantial, evidence remotely touching on defendant's mental competence came from his girlfriend who characterized him as "crazy" and "mentally sick" and likened him to a "mean drunk" when he consumed alcoholic beverages. This is scarcely heavy evidence to support a mental disease or defect defense. *State v. Thomas*, 625 S.W.2d at 124; *State v. Vansandts*, 540 S.W.2d 192, 204 (Mo.App.1976). Nevertheless, the jury was given clear opportunity to consider the mitigating circumstance of mental disease and defect within the language of the instruction given by defendant calling attention to his mental health, and the failure to mention "mental disease or defect" in those precise words in his instruction was not manifest error to him. This is not to say that omission of the specific words "mental disease or defect" would not be prejudicial error if requested and offered by a defendant at the propitious time.

### VIII.

■ During the penalty phase of the trial, the state introduced evidence of defendant's plea of guilty to another crime for which he had received a suspended imposition of sentence. He completed his probation period for that crime and now contends that the guilty plea with suspended imposition of sentence cannot be used as an aggravating circumstance under § 565.-006.2, RSMo Cum.Supp.1983 (repealed, Mo. Laws, S.B. 276 § 1 and replaced by § 565.-032.1(3), effective July 1, 1984).

This contention is without merit. Section 565.006.2 specifically provides that during the penalty phase that evidence in mitigation and aggravation of punishment shall be heard, "including the record of any prior criminal convictions and pleas of guilty."

The purpose of hearing such evidence is to fulfill the vital need during the penalty phase for the jury to have before it "as much information ... as possible when it makes a sentencing decision." *Gregg v.*

*Georgia*, 428 U.S. 153, 204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976); *State v. Gilmore*, 661 S.W.2d 519, 524 (Mo. banc 1983). Such information includes those crimes for which the defendant has either pleaded guilty or been found guilty and received a suspended imposition of sentence. In *State v. Acton*, 665 S.W.2d 618 (Mo. banc 1984), this Court held that past pleas of guilty with suspended sentences under prior or driving while intoxicated statutes constituted convictions for the purpose of sentence enhancement. Treating such guilty pleas as convictions for purpose of considering aggravating circumstances does not violate a person's constitutional rights.

### IX.

■ Defendant's final points of alleged error concern the death sentence imposed. The aggravating circumstance designated by the jury was that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind." Section 565.012.2(7). Defendant challenges the sufficiency of evidence to constitutionally support a finding of depravity of mind.

Depravity of mind as a statutory aggravating circumstance, passing constitutional muster, was upheld in *Gregg v. Georgia.* But *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) imposes strictures requiring the state to define the crimes which may result in death penalty in such a way as to obviate "standardless sentencing discretion." Care must be taken to apply the law so that there is no arbitrary or capricious infliction of the death penalty. *Id.* at 428, 100 S.Ct. at 1764. *Godfrey* resulted in the overturn of the death penalty recommended by the jury as the Georgia statute did nothing to prevent an arbitrary application of the death penalty.

The danger of imposing death by mere wafture of "depravity of mind" without proper tethers is manifest: that circumstance could be utilized as a "catchall" for murders not falling into any other statuto-

·ry aggravating circumstances. *Id.* at 429, 100 S.Ct. at 1765.

But the differences between this case and *Godfrey* are many and manifest. In *Godfrey,* the defendant shot and instantly killed his estranged wife and mother-in-law. The United States Supreme Court found that the crimes could not be said to have reflected a consciousness materially more "depraved" than that of any person guilty of murder. The facts of the case did not meet the standards, as set by Georgia courts at that time, for finding depravity of mind and torture. By their instant death, there was no time for the victims to be consciously aware of their fate for a period of time, there were no aggravated batteries or torture committed to them before their death, the mental state of the defendant was such that he was experiencing extreme emotional trauma, and he subsequently expressed remorse for his actions. *Id.* at 433, 100 S.Ct. at 1767.[3]

In following the mandate of *Godfrey* to establish "clear and objective standards" as to what types of murders constitute "depravity of mind," this Court, while not expressly adopting a precise definition, has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime. *State v. Blair,* 638 S.W.2d 739, 759 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983), *reh'g* denied, 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

In the case *sub judice,* it appears the jury could reasonably find facts that do meet the standards set in Missouri for finding "depravity of mind" such that the death penalty is not imposed arbitrarily or capriciously.

Pee Wee Richardson's murder is clearly within "depravity of mind" contemplation. The victim was physically and psychologically tortured before death. He was first told that he would be killed when defendant completed his clothes removal. He was forced to watch defendant undress, knowing absolutely what was to follow. He was stabbed several times into helplessness, incurring cuts to his hands as he attempted to fend off the feral attack. He was forced to watch as defendant killed Betty Klein, thereby being required further to contemplate his pending fate. He watched as defendant once again turned lupine attention back to him. Finally, he again tried to ward off the fatal, deadly blows of defendant's knife before his life was ended. The murders complete, defendant demonstrated his chilling indifference to human life and lack of remorse by teasing and talking to his lifeless victims and soaking his chicken in their fresh blood and eating it.

Defendant offered no meaningful provocation for his actions, as his disagreements with his brother and the victims several hours before the killings are trivial incidents that do not rise to the level of adequate agitation.

█ A dual purpose is served by the following reference to other death penalty cases in which the statutory aggravating circumstance of depravity of mind was certified: 1) for review of whether death sentence is excessive or disproportionate; 2) to establish that the actions of defendant are congruent with conduct of other defendants sentenced to die for depravity of mind crimes:

*State v. Guinan*—Victim was physically tortured by a series of stab wounds which caused him to bleed to death. The victim had ample time to anticipate his fate.

---

3. Georgia courts since *Godfrey* have interpreted depravity to mean serious psychological abuse before death or mutilation, serious disfigurement or sexual abuse after death. The physical characteristics of the victim, *i.e.,* age, are also considered. Yet the mere apprehension of death immediately before the fatal wounds are inflicted is not serious psychological abuse prior to death. *Phillips v. State,* 250 Ga. 336, 297 S.E.2d 217 (1982).

*State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983)—Victim was physically tortured by repeated stabbings and given substantial time to anticipate fate.

*State v. Smith,* 649 S.W.2d 417 (Mo. banc 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983)—Defendant chased victim for two blocks shouting his intent to kill, so victim, beaten with a tire iron, had substantial time to contemplate her pending doom.

*State v. LaRette,* 648 S.W.2d 96 (Mo. banc 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983)—Victim was stabbed repeatedly and incurred defense wounds to her hands. Victim had time to anticipate her fate.

*State v. Blair*—Defendant obvious in showing lack of remorse for killing of woman he had tortured.

*State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982), *cert. denied,* 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983)—Victim had died from five stab wounds, some inflicted while the victim was alive. Defendant showed lack of concern for human life.

*State v. Newlon*—Evidence of physical torture before death.

*State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981)—Psychological abuse to victim and torture prior to death.

The foregoing establish a uniform pattern in the application of depravity of mind. Defendant's actions fit well within the standard, and the death penalty as based on that aggravating circumstance is not in any way arbitrary or disproportionate.[4] Hence, *Godfrey v. Georgia* offers no impediment to the death penalty for defendant.

Defendant refers to other cases in which the defendant was spared death in depravity of mind circumstances.[5] But a review of these cases provides substantial distinction so they would not be applicable in this case.

Based on the requisite review of death penalty cases, we find that the sentence here imposed is neither disproportionate nor excessive in comparison to similar cases.

Judgment affirmed.

RENDLEN, C.J., and HIGGINS, BILLINGS, and DONNELLY, JJ., concur.

WELLIVER, J., concurs in result.

BLACKMAR, J., concurs in result in separate opinion filed.

BLACKMAR, Judge, concurring in result.

I fully concur in the principal opinion to the extent that it affirms the conviction of capital murder.

I also agree that the sentence of death is properly affirmed, but solely because I am bound by *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). That case involved a killing by several blasts of a shotgun, following a robbery. The only statutory aggravating circumstance found

---

**4.** Section 565.014, RSMo 1978, requiring determination by the Supreme Court of whether the death sentence is excessive or disproportionate in comparison to the penalty assessed in similar cases, is repealed, Mo.Laws, S.B. 276 § 1 and replaced by § 565.035, effective July 1, 1984.

 *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), considers California's death penalty statute which contains no proportionality review procedure. *Pulley v. Harris* holds that proportionality review is not a constitutional requirement.

 Interestingly, in a comparison with this case, the defendant in *Pulley v. Harris* shot and killed two teenagers who were eating hamburgers.

After the killings, defendant consumed the uneaten portions of his victims' hamburgers. But contrary to the circumstance of this case, the defendant in *Pulley* did express regret for the murders.

**5.** *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983); *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981); *State v. Bostic,* 625 S.W.2d 128 (Mo. 1981); *State v. Mitchell,* 611 S.W.2d 223 (Mo. banc 1981); *State v. Royal,* 610 S.W.2d 946 (Mo. banc 1981); *State v. Bashe,* 657 S.W.2d 321 (Mo.App.1983). In this category defendant also cites *State v. Woods,* No. 62378, transferred to the Missouri Court of Appeals.

by the jury is the same one which was found in this case.[1]

Our *Newlon* opinion stresses the deliberateness of the killing, as does Judge Gunn's opinion in this case. *Newlon* goes on to pose alternatives as follows:

> [I]f Mr. Dave was dead after the initial shot, the second blast, deliberately performed in the manner described, would have served to mutilate the corpse, a macabre purpose demonstrating depravity. If, on the other hand, Mansfield Dave was still alive, the second shot was to insure the killing, and the first blast from this sawed off shotgun must have inflicted extreme suffering....

*Id.* at 622.

I simply cannot believe that this showing was sufficient under *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), which requires "a consciousness materially more 'depraved' than that of any person guilty of murder ...", *Id.* at 433, 100 S.Ct. at 1767, and implicitly approved other Georgia cases requiring "torture or ... aggravated battery before killing...." *Id.* 431, 100 S.Ct. at 1766. The analysis of *Godfrey* in Judge Seiler's dissent seems essentially sound to me. 627 S.W.2d at 623, 626–27. The Supreme Court of the United States, however, let *Newlon* stand. That Court has often cautioned that denial of certiorari does not imply approval of the holding of the court below, but, when one of our decisions is challenged because of alleged conflict with a very recent decision, and certiorari is denied, there is presumptive support for our holding.

In this case, just as in *Newlon*, the victim, Richardson, must have suffered greatly between the time the defendant announced his intentions and the time of the last, fatal knife wound. The bizarre actions of the defendant following the killing may be analogized to the corpse mutilation which *Newlon* found significant. But for that case I would consider the circumstances set out in the principal opinion insufficient under *Godfrey. Cf. Phillips v. State*, 250 Ga. 336, 297 S.E.2d 217 (1982), holding that mutilation of a corpse is not sufficient to demonstrate "depravity" in the sense required in *Godfrey*. I find much more indication of depravity in the *Godfrey* case than here or in *Newlon. See* dissenting opinion of Justice White in *Godfrey*, 446 U.S. at 444, 450–51, 100 S.Ct. at 1773, 1776–77, and also the statement of the defendant, "I have been thinking about it for eight years ... I'd do it again...." *Id.* at 426, 100 S.Ct. at 1763. I also utterly reject the suggestion of the Attorney General, made at oral argument, that *Godfrey* is authoritative only under the Georgia statute and not under our statute.[2] Nor do I accept the suggestion in *Newlon* that "Godfrey ... rests on its unique facts...." *Id.* at 621. I do not believe that the Supreme Court of the United States grants certiorari to consider unique facts.

Because of *Newlon*, however, my vote is to affirm the conviction and the sentence. The double killing persuades me that the case is more aggravated than *Newlon*, *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983) and *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984).

---

1. Section 565.012.2(7), RSMo Cum.Supp.1983, reads as follows: "The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind;"

2. The portion of the Georgia statute there under consideration reads as follows:

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravating battery to the victim. Ga.Code Ann. § 27–2534.1(b)(7) (1978).